80 U.S. 531 (____)
13 Wall. 531
STOCKWELL
v.
UNITED STATES.
Supreme Court of United States.

*537 Mr. R.H. Dana, for the plaintiffs in error.
Mr. B.H. Bristow, Solicitor-General, and Mr. C.H. Hill, Assistant Attorney-General, contra.
*541 Mr. Justice STRONG delivered the opinion of the court.
The first error assigned is that a civil action of debt will not lie, at the suit of the United States, to recover the forfeitures *542 or penalties incurred under this act of Congress, and that the court below erred in holding that such an action might be maintained. It is not contended that an action of debt will not lie to recover duties, if the defendant be the owner or importer of the goods imported, for it is conceded that by the act of importing an obligation to pay the duties is incurred. The obligation springs out of the statutes which impose duties. Nor is it doubted that when a statute gives to a private person a right to recover a penalty for a violation of law he may maintain an action of debt, but it is insisted that when the government proceeds for a penalty based on an offence against law, it must be by indictment or by information. No authority has been adduced in support of this position, and it is believed that none exists. It cannot be that whether an action of debt is maintainable or not depends upon the question who is the plaintiff. Debt lies whenever a sum certain is due to the plaintiff, or a sum which can readily be reduced to a certainty  a sum requiring no future valuation to settle its amount. It is not necessarily founded upon contract. It is immaterial in what manner the obligation was incurred, or by what it is evidenced, if the sum owing is capable of being definitely ascertained. The act of 1823 fixes the amount of the liability at double the value of the goods received, concealed, or purchased, and the only party injured by the illegal acts, which subject the perpetrators to the liability, is the United States. It would seem, therefore, that whether the liability incurred is to be regarded as a penalty, or as liquidated damages for an injury done to the United States, it is a debt, and as such it must be recoverable in a civil action.
But all doubts respecting the matter are set at rest by the fourth section of the act, which enacted that all penalties and forfeitures incurred by force thereof shall be sued for, recovered, distributed, and accounted for in the manner prescribed by the act of March 2d, 1799, entitled "An act to regulate the collection of duties on imports and tonnage." By referring to the 89th section of that act it will be seen that it directs all penalties, accruing by any breach of the *543 act, to be sued for and recovered, with costs of suit, in the name of the United States of America, in any court competent to try the same; and the collector, within whose district a forfeiture shall have been incurred, is enjoined to cause suits for the same to be commenced without delay. This manifestly contemplates civil actions, as does the proviso to the same section, which declares that no action or prosecution shall be maintained in any case under the act, unless the same shall have been commenced within three years after the penalty or forfeiture was incurred. Accordingly, it has frequently been ruled that debt will lie, at the suit of the United States, to recover the penalties and forfeitures imposed by statutes.[*] It is true that the statute of 1823 imposes the forfeiture and liability to pay double the value of the goods received, concealed, or purchased, with knowledge that they had been illegally imported, "on conviction thereof." It may be, therefore, that an indictment or information might be sustained. But the question now is, whether a civil action can be brought, and, in view of the provision that all penalties and forfeitures incurred by force of the act shall "be sued for and recovered," as prescribed by the act of 1799, we are of opinion that debt is maintainable. The expression "sued for and recovered" is primarily applicable to civil actions, and not to those of a criminal nature.
The second assignment of error is that the jury were instructed the knowledge of the defendants required by the statute in order to render them liable, was conclusively presumed from the knowledge of their agent, their partner in the transaction. This is hardly a fair exhibition of what the court did charge. The instruction given to the jury, and all that is assigned for error, was that "if Leman Stockwell, as a member of the firm, engaged in the shingle business at the time of the importation and reception of the shingles at *544 Bangor, knew that they were Province shingles, liable to duty and seizure, and illegally imported, it was not necessary for the government to prove that the defendants personally had actual knowledge of these facts, which were then within the knowledge of their partner, Leman Stockwell." This is all which is embraced in the assignment. But the court added, that "if with this knowledge, as before stated on Leman's part, that the shingles were illegally imported and liable to seizure, D.R. Stockwell & Co., in the usual course of the business, received the shingles at Bangor, and they were disposed of by them, and the profits of the business divided as stated above, the jury were authorized to find that the defendants, being Leman's partners, received the shingles knowing the same were illegally imported and liable to seizure." Taking this together, and it must be so taken, for the exception was general to the instructions given, it cannot be said to justify the complaint that the court ruled knowledge of the defendants that the shingles had been illegally imported was conclusively presumed from the knowledge of Leman Stockwell, their partner. Qualified by what was added to the language alleged to be erroneous, it amounts to no more than that the jury might presume such knowledge from the facts stated.
To understand the force and merits of this instruction it is necessary to notice concisely the facts of which evidence had been given at the trial.
The defendants were lumber dealers resident in Bangor, in the State of Maine, and partners under the firm name of D.R. Stockwell & Co. In 1863 they made an arrangement with Leman Stockwell, a brother of one of the partners, that he should go to Aroostook County, in Maine, and to Frederickton and St. John, in the Province of New Brunswick, and there collect, buy, and forward shingles, consigned to the firm at Bangor. By the arrangement he became a partner with them in the shingle business, done in pursuance of it. He purchased shingles and shipped them from St. John to Bangor, consigned to the firm. Some of these shingles were of Provincial growth, known to Leman Stockwell *545 to be such. They were of course subject to duties. There was evidence that Leman Stockwell knew them to be subject to duties, and liable to seizure if the duties were not paid, and that with that knowledge he exported them from St. John, documented as of the growth of Maine, with the intent that they should be, and in order that they might be, imported as free from duty. When the cargoes came to Bangor, in 1863 or 1864, the defendants reported them at the custom-house with the manifest and foreign clearances, and with certificates, or affidavits, of their American origin. No duties were therefore exacted, nor were entries required to be made, or invoices, or bills of lading to be produced; but the collector allowed the shingles to be taken to the sheds of the defendants, where they were received, sorted, and sold in the usual manner of the trade. An account was kept of the business, and at the end of each year the profits were divided between Leman Stockwell and the members of the firm. When subsequently it was discovered, after all the shingles had been sold, that they were not of American origin, but were the growth of the Province of New Brunswick, and as such subject to duties, and consequently that they had been illegally imported, in fraud of the revenue laws, this action was brought, and at the trial the defendants requested the court to charge the jury "that they must be satisfied, as to each defendant, that he knew that the shingles had been illegally imported, and were liable to seizure, before he received, concealed, or bought the same; and that such receiving, concealing, or buying must have been with an intent to defraud the revenues." The court, however, instructed the jury, as we have above stated. It is now insisted that in thus charging the jury the court fell into error. The argument is rested mainly upon the assumption that the statute upon which the action is founded is a penal statute intended solely for the punishment of crimes against the revenue laws. It is not seriously denied that in civil transactions a principal or a partnership is affected by the knowledge of the agent or copartner, and that the knowledge of the agent is in law attributed to his principal, as *546 well as that of the partner to all the members of the firm; nor is it much insisted that a principal, or copartner, is not liable for the tort of an agent, or copartner, done without his knowledge or authority, in suits brought by third persons to recover compensation, or indemnity for loss sustained in consequence of the tort; but it is argued that the rule does not apply in the case of suits for a penalty. It becomes, then, material to consider the nature and purposes of the statute under which it is claimed the liability of the defendants has arisen. Is it strictly punitive, or is it remedial?
When foreign merchandise, subject to duties, is imported into the country, the act of importation imposes upon the importer the obligation to pay the legal charges. Besides this the goods themselves, if the duties be not paid, are subject to seizure and appropriation by the government. In a very important sense they become the property of the government. Every act, therefore, which interferes with the right of the government to seize and appropriate the property which has been forfeited to it, or which may hinder the exercise of its right to seize and appropriate such property, is a wrong to property rights, and is a fit subject for indemnity. Now, it is against interference with the right of the government to seize and appropriate to its own use property illegally imported that the statute of 1823 was aimed. It was to secure indemnity for a wrong to rights of property. The instant that goods are illegally imported, the instant that they pass through the custom-house without the payment of duties, the right of the government to seize and appropriate them becomes perfect. If any person receives them, knowing them to have been illegally imported, or conceals them, or buys them, his act necessarily embarrasses, if it does not defeat altogether the possibility of the government's availing itself of its right and securing the property. It is therefore manifest that the act of 1823 was fully as remedial in its character, designed as plainly to secure civil rights, as are the statutes rendering importers liable to duties. Its plain purpose was to protect the government in the unembarrassed enjoyment of its rights to all goods and *547 merchandise illegally imported, and it proportioned indemnity for infringement upon such rights to the loss which such infringement might cause. The amount recoverable is in proportion to the value of the goods abstracted or concealed, or bought, not at all in proportion to the degree of criminality of the act of receipt or concealment. Obviously there may be more guilt in concealing goods illegally imported, worth only one hundred dollars, than in receiving or concealing imported property worth ten times as much, but the statute measures the liability not by the guilt but by the value of the goods. It must therefore be considered as remedial, as providing indemnity for loss. And it is not the less so because the liability of the wrongdoer is measured by double the value of the goods received, concealed, or purchased, instead of their single value. The act of abstracting goods illegally imported, receiving, concealing, or buying them, interposes difficulties in the way of a government seizure, and impairs, therefore, the value of the government right. It is, then, hardly accurate to say that the only loss the government can sustain from concealing the goods liable to seizure is their single value, or to assert that the liability imposed by the statute of double the value is arbitrary and without reference to indemnification. Double the value may not be more than complete indemnity. There are many cases in which a party injured is allowed to recover in a civil action double or treble damages. Suits for infringement of patents are instances, and in some States a plaintiff recovers double damages for cutting timber upon his land. It will hardly be claimed that these are penal actions requiring the application of different rules of evidence from those that prevail in other actions for indemnity. Regarding, then, an action of debt founded upon the act of 1823 as a claim for compensation or indemnity, it cannot be maintained upon authority or principle that the knowledge of the agent that the goods had been illegally imported is not presumptively the knowledge of the principal. That as a general rule partners are all liable to make indemnity for the tort of one of their number, committed by him in the course of the partnership *548 business, is familiar doctrine. It rests upon the theory that the contract of partnership constitutes all its members agents for each other, and that when a loss must fall upon one of two innocent persons he must bear it who has been the occasion of the loss or has enabled a third person to cause it. In other words, the tortious act of the agent is the act of his principals, if done in the course of his agency, though not directly authorized. And this is emphatically true when the principals, as in this case, have received and appropriated the benefit of the act. These defendants received the shingles on their arrival at Bangor, presenting at the custom-house false certificates of their American origin. They paid no duties. They removed the property to their own lumber sheds, sold it, and divided the profits, retaining a portion for themselves. They have therefore now the proceeds of sale of property which was not their own, but which had been forfeited to the United States, and they have secured and they now hold these proceeds through the tortious act of their own partner, who planned and effected the fraudulent importation for their benefit and his. Can it be that they may derive a profit from his fraud and yet repudiate his act by asserting that his knowledge of the fraud does not affect them? If they can, the revenue laws will be found utterly ineffectual to protect the revenues of the government, and facilities to fraud will be abundant. If an irresponsible agent consigns to his principal foreign merchandise, documenting it as of American growth or production, it will always be difficult if not impossible to prove knowledge by the principal that the agent has perpetrated a fraud, and if that is necessary to give to the government a right of action under the act of 1823 against the principals who claim or conceal property thus brought into the country, the act utterly fails to secure a remedy for the mischief against which it was intended to guard.
The plaintiffs in error have argued that in all cases where knowledge is by statute made essential to liability, whenever an attempt is made to hold a principal or partner responsible *549 for a loss occasioned by the act of his agent, or partner, the question of his knowledge, apart from that of the agent, is submitted to the jury, or, in other words, the knowledge of the agent or partner is regarded as distinct from that of the principal. Numerous cases have been cited which it is supposed support this position. We do not find, however, that such is the doctrine of any of them. The case of Regina v. Dean, one of the cases cited, was an information for penalties under the Smuggling Prevention Act of 3 and 4 Will. IV, in which the defendant was charged, inter alia, with knowingly harboring goods imported and illegally unshipped without payment of duties. At the trial it appeared that a clerk of the defendant, with the assistance of two custom-house officers, had made false entries of the quantities of goods imported, but no knowledge of the fraud was brought home to the defendant, though it appeared that he had, or must have derived benefit from the fraudulent transaction. Lord Abinger told the jury that as the defendant had derived benefit from the fraud, they might infer knowledge on his part of the fraud having been committed, and that the case, under those circumstances, would be made out against the defendant. This was very like the instruction given, of which the plaintiffs in error complain. On a motion for a new trial, for misinstruction, the Exchequer refused a rule. It was conceded in the argument that when goods illegally imported, without payment of duties, are brought to the place of business of a trader, by an agent or clerk of his, known by him not to have paid any duty, and are found there, there is a fair inference he knew the duties had been evaded. The ruling in this case was in a criminal proceeding. The information was for a penalty, and not for the value of the goods. Graham v. Pocock is another case cited. There the defendants were sued, and one of them was held liable for unshipping and landing goods liable to forfeiture. No question of knowledge was mooted. And in none of the other cases cited do we find it held that in civil actions for indemnity, or for double or treble value, the knowledge of the agent is not to be imputed to the principal. Upon this *550 subject the opinion of this court has been outspoken, and it has been in accordance with the instruction given to the jury in the case before us.[*] The principle asserted in all those cases is that whatever an agent does, or says, in reference to the business in which he is at the time employed, and within the scope of his authority, is done, or said, by the principal; and may be proved, as well in a criminal as a civil case, in like manner as if the evidence applied personally to the principal.
The British statutes for the prevention of smuggling differ from our act of 1823. They are both penal and remedial. They impose not only a liability for treble value of goods illegally imported, upon assisting in unlading them, or knowingly harboring or concealing them, but also a stipulated penalty, in some cases leaving to the revenue commissioners to determine whether proceedings shall be instituted for the penalty or for treble the damages. Yet in both classes of cases the fraudulent act of a servant is held attributable to his master when the master has derived a benefit from the illegal importation.[] We think, therefore, the charge of the court, of which the plaintiffs in error complain, was not erroneous.
It is next contended that section second of the act of 1823 cannot be construed to apply to the illegal importers themselves. As it extends only to acts done after the illegal importation and requires knowledge of its illegality, it is argued that it aims rather at accessories after the fact. We think, however, it embraces both. If it does not, then greater liabilities are laid on the accessory than on the principal. The mischief at which the act aimed was, as we have seen, embarrassing the right of the government to seize the forfeited goods. That may be done as well by importers as *551 others. They may receive the goods or conceal them, and the wrong to the government is precisely the same, whether the concealment is by them or by others who were not the importers. It certainly would be most strange if the accessory to a wrongful act were held responsible therefor when the principal goes free. As was said in Graham v. Pocock, the question who is liable for receiving, concealing, or buying the shingles is a question to be determined irrespective of the inquiry who is the principal and who the accessory.
Finally, it is argued that the act of 1823 (section 2) was repealed by the act of July 18th, 1866, entitled "An act further to prevent smuggling, and for other purposes," the 4th section of which enacted "that if any person shall fraudulently or knowingly import or bring into the United States any goods, wares, or merchandise contrary to law, or shall receive, conceal, buy, sell, or in any manner facilitate the transportation or concealment or sale of such goods, wares, or merchandise after their importation, knowing the same to have been imported contrary to law, such goods, wares, and merchandise shall be forfeited, and he or she shall, on conviction thereof before any court of competent jurisdiction, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both, at the discretion of such court." The 43d section of that act enacted that all other acts and parts of acts conflicting with or supplied by it should be repealed. It is now insisted that the act of 1823 was in conflict with this act, or, if not, that it was supplied by it. Very clearly, however, this is not maintainable. The act of 1823 was, as we have seen, remedial in its nature. Its purpose was to secure full compensation for interference with the rights of the United States. The act of 1866 is strictly penal, not at all remedial. It was avowedly enacted further to prevent smuggling. Its design, therefore, was not to substitute new penalties which might be less onerous than the liabilities which former acts had imposed, but to punish as a crime that which before had subjected its perpetrator *552 to civil liability, or quasi civil liability. Hence it is cumulative in its character rather than substitutionary. If it has indeed only supplied what was enacted in 1823, then a party who conceals goods illegally imported and forfeited to the United States is subject to no more than a fine of five thousand dollars, with possible imprisonment, though the goods concealed and thereby wholly lost to the government may be worth one hundred thousand dollars, and this, though the declared purpose of the act was more effectually to prevent smuggling. This cannot be. There is no inconsistency between a remedy for an illegal act which works a private wrong, securing pecuniary compensation, and a statute making the same act a criminal offence and punishing it accordingly. Were there nothing more, then, in the act of 1866 than the 4th and the 43d sections, we should feel compelled to hold that the 2d section of the act of 1823 was not repealed by it. But the 18th section expressly enacted that nothing in the act shall be taken to abridge or limit any forfeiture, penalty, fine, liability, or remedy provided for or existing under any law then in force, except as in the act was specially provided. Certainly the act contains no special provision for the civil remedy given by the act of 1823. It merely imposes punishment and superadds criminality to that which before was a civil injury. It is said the court will not construe the statutes so as to give the executive department the option to treat two citizens who have done the same act affecting the same cargo in such manner that one statute may be applied to one, and a different statute to another, thus causing different consequences. But the true question is whether a wrongdoer may not be both civilly and criminally responsible for the same act, and it would not be strange if Congress had given the option to sue for double values, or to prosecute for the crime. The British statutes against smuggling, as we have stated, allow suits for treble value of goods illegally imported and harbored, or prosecutions for penalties, at the election of the government. Our opinion, then, is that the 2d section of the act of 1823 was not repealed by the act of 1866, *553 certainly not so as to affect this suit, brought to enforce liabilities incurred before the later act was passed.
JUDGMENT AFFIRMED.
Mr. Justice FIELD, dissenting.
I am compelled to dissent from the judgment of the court in this case.
I am of opinion:
1st. That the penalty of the second section of the statute of March 3d, 1823, is superseded and repealed by the act of July 18th, 1866;
2d. That if the penalty be not thus repealed, the provisions of the section are not applicable to importers; and,
3d. That if the penalty be in force, and the section be applicable to importers, the court below erred in ruling that the knowledge by the defendants required by the section to subject them to the penalty prescribed, could be conclusively presumed from the knowledge possessed by their partner.
The second section of the statute of 1823, under which the defendants are charged, is directed against the receiving, the concealing, and the buying of goods illegally imported and liable to seizure. It is not directed against anything else. Whoever does one of these three things, knowing that the goods have been illegally imported, and are liable to seizure under any act relating to the revenue, is subject, on conviction thereof, to a penalty of double the amount or value of the goods.[*]
The statute of July 18th, 1866,[] in its fourth section, embraces not merely the three things designated in the statute of 1823, but several other things not thus designated in connection with the illegal importation of goods, or the disposal of such goods; and it prescribes for each a different penalty from that provided in the first statute. It is directed against the fraudulent importation of goods as well as against receiving, concealing, and buying them after they are thus *554 imported. It further includes what is omitted in the statute of 1823, the selling of such goods and facilitating their transportation, concealment, and sale. It also declares that such goods shall be forfeited, and that every person who does any one of the things enumerated, shall, on conviction thereof, be subjected to a fine in a sum not exceeding five thousand dollars, nor less than fifty dollars, or to imprisonment not exceeding two years, or to both, in the discretion of the court. This is not all; the statute declares that present or past possession of the goods by the defendant shall be sufficient evidence to authorize his conviction, unless such possession be explained to the satisfaction of the jury.
The statute of 1866, as thus appears, is much broader in its provisions than the statute of 1823. It supplements the first statute by including as offences acts there omitted though equally connected as those designated with the disposal of goods illegally imported, and by providing a rule of evidence which renders it less difficult for the government to enforce the prescribed penalties. Had the statute of 1866 stopped here, there would be no pretence that it conflicts with the statute of 1823. But it does not stop here; it goes farther and changes the punishment for the offences designated. By the first statute, the receiving, concealing, or buying any goods by a person knowing them to be illegally imported and liable to seizure under any revenue act, is punishable by a forfeiture of double the value of such goods. By the second statute, the receiving, concealing, or buying goods after their importation, by a person knowing them to have been imported contrary to law, is punishable by fine and imprisonment, or both, at the discretion of the court. In both acts the same offences are designated, for the liability to seizure attends all illegal importation, and a knowledge of this latter fact necessarily includes the other. Both acts are penal; the first equally so as the last, for it does not go for the value of the goods, or indemnification to the government, but for the enforcement of a penalty upon a party offending in any of the particulars mentioned. *555 The very definition of a penal statute is that it is a statute which inflicts a penalty for the violation of its provisions. It is admitted in the opinion of the majority of the court that the offences designated in the act might be prosecuted by information or indictment, an admission which seems to me to be inconsistent with the position that the act is not penal. I have not been aware that an information or an indictment could be founded on any statute which was not penal in its character.
Different punishments being prescribed for the same offences by the two statutes, the latter statute must be held, according to all the authorities, to have superseded and repealed the penalty prescribed by the first statute. Such was the unanimous decision of this court in Norris v. Crocker, reported in 13th Howard, a case which does not differ from this in any essential particular. That was an action of debt to recover a penalty prescribed by the fourth section of the act of Congress of 1793, respecting fugitives from justice and persons escaping from the service of their masters. That section declared that any person who should knowingly and willingly obstruct or hinder the claimant, his agent, or attorney in seizing or arresting the fugitive from labor, or should rescue him from such claimant, agent or attorney when arrested pursuant to the authority given by the act, or should harbor or conceal him after notice that he was a fugitive from labor, should for each of these offences forfeit and pay the sum of five hundred dollars, to be recovered in an action of debt.
Pending the action brought under this section, Congress, in 1850, passed an act amendatory of, and supplementary to, the act of February, 1793, the seventh section of which embraced the same offences specified in the act of 1793, and created new offences and prescribed as a punishment for each offence fine and imprisonment upon indictment and conviction of the offender; the fine not to exceed a thousand dollars and the imprisonment not to exceed six months.
For obstructing the claimant or rescuing the fugitive, or harboring him, the act of 1793 declared that the offender *556 should "forfeit and pay" for each offence a specified sum, and authorized its recovery by civil action. For the same offences of obstructing the claimant, rescuing the fugitive, or harboring him, as well as for offences of a similar character, the act of 1850 declared that the offender should be punished by fine and imprisonment, and that this punishment should be enforced upon indictment and conviction.
The act of 1850 contained no repealing clause in terms, yet the court held unanimously that it was repugnant to the act of 1793, and necessarily operated as a repeal of the penalty of that act. That case is not distinguishable in principle from the case at bar. The act of 1793, like the act of 1823, prescribed a penalty recoverable by civil action. The act of 1850, like the act of 1866, prescribed, for the offences designated, fine and imprisonment enforceable by indictment.
It was urged with great force in the case of Crocker v. Norris, on the part of the government, that the act of 1850 only added cumulative remedies, and was enacted to give greater facilities to the master of the slave in securing the fugitive; that it was, as its title indicated, amendatory of and supplementary to the original act, and was designed to carry more effectually into execution a provision of the Constitution, and it could not be supposed that Congress having this object in view intended to repeal the act of 1793, and wipe out liabilities incurred under that act, and thus deprive the master of rights of action in suits then pending; but the court thought otherwise, Mr. Justice Catron delivering its opinion, and observing that, "as a general rule it was not open to controversy, that where a new statute covers the whole subject-matter of an old one, adds offences, and prescribes different penalties for those enumerated in the old law, that the former statute is repealed by implication, as the provisions of both cannot stand together."
The court did not seem to think that the fact that the penalty designated in the act of 1793 was enforced by a civil action, and the penalty designated in the act of 1850 was enforced by indictment, made any difference. In principle *557 the mode of enforcement could not alter the substantial and important fact that the penalty for the same offence was changed, and that by the change the sovereign power which created the original law had declared that its penalties should no longer be enforced.
If there were no other provisions of law than the two sections mentioned of the acts of 1823 and 1866 before us, I should not hesitate to repeat the language of this court in Norris v. Crocker, that it is not open to controversy that the latter act repeals the penalty prescribed by the former. But there is another provision of law which removes, as it appears to me, all possible doubt as to the intention of Congress. The forty-third section repeals several acts by name, and also "all other acts and parts of acts conflicting with or supplied by this act."
Now, in my judgment, it does not admit of any question that an act, like that of 1866, which declares that certain specified offences shall be punished by fine or imprisonment, or both, does conflict with an act like that of 1823, which provides that the same offences shall be punished by a forfeiture of double the value of the goods in respect to which the offences are committed. And it appears to me that I have pointed out several particulars in which omissions of the act of 1823 are supplied by the act of 1866.
The eighteenth section of the act of 1866, which is supposed by the majority of the court to preserve the penalty of the act of 1823, does, in my judgment, when read in connection with other provisions, have directly an opposite effect. That section declares "that nothing in the act shall be taken to abridge, or limit, any forfeiture, penalty, fine, liability, or remedy provided for or existing under any law now in force, except as herein otherwise specially provided." This means, as I read it, that the same punishments prescribed by law then in force, without abridgment or limitation, that is in kind, and extent, and mode of enforcement, shall continue to exist, unless for such offences other penalties and remedies are specially provided; and this is equivalent to declaring that such punishments and remedies *558 shall not continue to exist when other special provisions are made on the subject.
But if I am mistaken in this construction, and Congress did actually intend this strange and anomalous legislation, that for the offences designated there should be three distinct punishments inflicted: 1st, by a forfeiture of double the value of the goods illegally imported; 2d, by a forfeiture of the goods themselves; and, 3d, by fine, which may go from fifty dollars to five thousand, or by imprisonment, which may extend to two years, or by both; then I contend that the act of 1823 does not apply to the defendants in this case. They were the importers of the goods for double the value of which they are sued; and the section applies only to offences committed after their importation. It is directed against the offences of receiving, concealing, or buying the goods with knowledge of their having been illegally imported and being liable to seizure. There are numerous other acts providing punishment for all forms of illegal importation. This act was only intended to reach those who, after the original offence was committed, in some way aided, with knowledge of that offence, in keeping the goods out of the reach of the government. The language used is inappropriate and inapt to describe an act of the illegal importer. It is limited to an act done after the illegal importation. It requires knowledge of such importation, which, as counsel observes, it would be absurd to require of the illegal importer himself. He receives his own goods in the act of importation, not afterwards; he cannot buy them of himself; and if he conceals them it is only an act in execution of the original offence.
The language is appropriate to describe an offence, which is in its nature accessorial after the fact, and counsel have cited several instances of legislation, where similar language has always been held applicable only to accessories after the fact. Thus in the Crimes Act of 1790[*] it is enacted "that if any person shall receive or buy any goods" stolen from *559 another, "knowing the same to be stolen," he shall be subjected to like punishment as in case of larceny. No one has ever supposed that this language was applicable to the act of the original offender. So in the General Post Office Act of 1825[*] it is enacted, in the forty-fifth section, "that if any person shall buy, receive, or conceal" any article mentioned in a previous section, "knowing the same to have been stolen or embezzled from the mail," he shall be fined and imprisoned. It has never been thought that the purchaser, receiver, or concealer of the stolen property, with knowledge of the larceny, was any other than an accessory after the fact.[]
So in the act of 1825, more effectually to provide for the punishment of certain crimes,[] it is enacted that if any person upon the high seas shall "buy, receive, or conceal" any money, goods, bank-notes, or other effects, subject to larceny, feloniously taken, or stolen from another, "knowing the same to have been taken or stolen," he shall be deemed guilty of a misdemeanor and be punished by fine and imprisonment. And the act shows, on its face, that the language was intended only for the offence of an accessory, for it declares that the person offending may be prosecuted, although the principal offender chargeable or charged with the larceny shall not have been prosecuted or convicted.
In all these cases the receiver, the concealer, and the buyer are accessories after the fact, and the language would be inappropriate if applied to them in any other character; and in the present case it would be extending, in my judgment, the construction of a penal statute beyond all precedent to apply these terms, in the act of 1823, to the original importers.
The act which the illegal importer is likely to do, after the importation, is to sell the goods, but the statute of 1823 does not make the act of selling them an offence. The statute of 1866 does, however, remedy this defect, which is *560 one evidence, among others, that it was intended to supply the deficiencies of the original act, and thus supersede it.
The declaration in the case in the counts, upon which double the value of the goods is charged, does not allege that the defendants illegally imported the goods, but that such importation was made by persons unknown, and that the defendants, knowing of the illegal importation, received, concealed, and bought them. Yet it appears that the entire action of the court on the trial, and its instructions to the jury, proceeded upon the supposition that the defendants and the absent partner were the owners of the goods, and that the defendants made the importation. It is expressly stated in the bill of exceptions that no attempts were made by either of the defendants, or any person connected with them, to conceal the property imported, or in any way to interfere with the exercise of the power of seizing it. The case rests, therefore, entirely upon the alleged acts of receiving and buying.
If the penalty of the act of 1823 be not superseded and repealed, and the words used in that act are susceptible of the application made of them, I am still of opinion that the judgment should be reversed, for the ruling of the court below, that the knowledge of the illegal importation by the defendants, required by the act, was to be conclusively presumed from the knowledge possessed by their partner. The instruction of the court clearly went to this extent. After stating hypothetically to the jury that if certain matters were done by Leman Stockwell, the shingles sent by him from New Brunswick to Bangor were illegally imported, the court instructed them as follows:
"This being a civil action, and not a criminal prosecution, the knowledge of one of the firm on these matters in this suit, is to be deemed the knowledge of the defendants, his copartners in the shingle business.
"If Leman Stockwell, as a member of the firm engaged in the shingle business, at the time of the importations and reception of the shingles at Bangor, knew that they were Province shingles, liable to duty and seizure, and illegally *561 imported, it is not necessary for the government to prove that the defendants personally had actual knowledge of these facts, which were then within the knowledge of their partner, Leman Stockwell."
Here the court tells the jury that the knowledge of one of the firm, Leman Stockwell, is to be deemed the knowledge of the defendants, and that it is not necessary for the government to prove that the defendants, personally, had actual knowledge of the facts, which were within the knowledge of their partner.
If this language does not amount to an instruction that knowledge of the illegal importation by the defendants is to be conclusively presumed from the knowledge of their partner, it is difficult to perceive what else can be made of it.
The ruling of the court in this respect goes against all notions which I have hitherto entertained of the law on the subject of imputed guilty knowledge, and my sense of justice revolts against its application. I cannot reconcile to either law or justice the doctrine that a person can be charged and punished for knowingly doing a thing of which he never had any actual knowledge; and that in a proceeding to enforce penalties imposed for knowingly doing a thing charged, the knowledge, which is an essential ingredient of the offence, can be conclusively imputed to him from its possession by another.
The claim in question, it is to be remembered, is not made for the forfeiture of the goods; that would follow from the act of illegal importation, without reference to the parties engaged. Neither is it made for the duties, for the right to them accrues to the government upon the importation. The claim is not for indemnification, but for penalties prescribed.
The principle upon which partners are made liable for the acts of each other is that each partner is the general agent of the partnership in all matters within the scope and objects of the partnership business. The liability and the limitations upon the liability are measured by the nature of the business of the partnership. The acts of one partner beyond that *562 business will not bind the firm, for his agency goes not to that extent.
Nor will any act of a partner, done in violation of law, bind his partners unless they originally authorized or subsequently adopted it. Such authorization and adoption are not matters to be presumed from the relationship of the partners to each other, but are to be proved like any other matters done outside of the scope of the partnership business, for which liability is sought to be fastened on the firm. It will often happen, owing to the position of the parties, the nature of the business, and the character of the act, that this authorization or adoption will be inferred from very slight additional circumstances. Thus in some cases it might be inferred that the importation of goods by one partner, without payment of the duties thereon, was approved by the other partners from the management taken by each partner in the affairs of the firm, and the knowledge which such management must give of the payments made and goods received. A jury might sometimes even be justified in inferring authority or approval of the other partners from their silence. But very different evidence would be required if, when one partner made the importation, the other was absent from the country or was a silent partner, taking no part in the management of the affairs of the firm. In the present case the importation of the shingles by the defendants might have been consistent with entire ignorance that they were the product of New Brunswick, and therefore subject to duties. It does not appear that there was anything in their shape or character which would inform the defendants of their foreign origin, or anything which would excite the suspicions, even, of the defendants on the subject. They were brought to Bangor accompanied by the proper documentary evidence that they were of American origin.
Leman Stockwell, who was engaged in purchasing shingles in Maine and New Brunswick, was entitled to half the profits of the partnership, and the illegal transaction may have originated with him, to enlarge his share of the profits, and all knowledge that the shingles were of foreign origin *563 may have been concealed by him from the defendants. Many motives may be suggested for such concealment. His designs may have been frustrated or endangered by communicating them to his partners. Be this, however, as it may, certain it is that such knowledge by them cannot be presumed from the naked fact of their partnership with him. Presumptions are conclusions which the law draws from a particular state of facts, and the law does not draw from the mere fact of partnership the conclusion that one partner approves or is cognizant of the illegal acts of the other, but, on the contrary, the presumption of innocence, which every one may invoke for his protection when accused, repels such conclusion. The doctrine of imputed knowledge, and consequently of imputed guilt in such cases, finds no support in principle or authority. The adjudged cases all speak another language without a dissentient voice. Even the case of Regina v. Dean,[*] cited in the opinion of the majority, does not militate against this view. That was an information for penalties for unshipping goods without payment of duties, knowingly harboring them, and removing them from a place of security. Under a practice of the custom-house the goods had been received without payment of the duties, an entry of the contents of the cases containing the goods having been made in a book kept for that purpose by the officers of the customs. A clerk of the defendant had removed the leaves in the book containing the entry and substituted other leaves containing false entries of the goods. There was no direct evidence that the defendant had been previously concerned in tampering with the book, nor was knowledge of the fraud brought directly home to him; but it appeared that he had, or must have, derived benefit from the fraudulent transaction. Under these circumstances the court told the jury that as the defendant had derived a benefit from the fraud, they might infer knowledge of the fraud on his part. On motion for a new trial, Baron Alderson, one of the judges, said:
"I think there was evidence for the jury of the defendant's being acquainted with this fraud.
*564 "He obtained possession of goods for which less than the proper duty appeared to have been paid. If that were not so, it was incumbent on him to show that he paid the full amount of duty. He must have had books to show the price of the goods, and the amount of duties payable in respect of them; and those books he does not produce. He derives benefit from the fraud, and therefore the jury were warranted, in the absence of evidence to the contrary, in inferring that he had a knowledge of it."
It is not perceived that this case, where the question of knowledge was left to the jury, can give support to the ruling in the case at bar, which was substantially, as I understand it, that knowledge must be conclusively presumed from the fact of copartnership.
The case of Graham v. Pocock, recently decided by the Privy Council in England, is not without bearing upon this case, for it decides that one partner cannot be subjected to a penalty for an illegal entry by his partner of goods belonging to the partnership where he did not himself personally participate in such entry.[*] The report shows that appeals were taken from judgments in two actions brought upon an ordinance of the Colony of the Cape of Good Hope. That ordinance provided that no goods should be unladen from a ship in that colony until entry was made of the goods and warrants were granted for their unloading; that the person entering the goods should deliver to the collector a bill of entry containing, among other things, the particulars of the quality and quantity of the goods; and that any goods taken or delivered from a ship, by virtue of an entry or warrant not properly describing them, should be forfeited. The fiftieth section of the ordinance further provided that every person who should assist, or be otherwise concerned, in the unshipping, landing, or removal, or the harboring of such goods, should be liable to a penalty of treble the value thereof, or to a penalty of a hundred pounds, at the election of the officers of the customs. The first action was brought for *565 the forfeiture of goods imported by the respondents; the second action was brought for the penalty of treble the value of the goods under the fiftieth section. The facts of the cases were these: The respondents, Pocock and Matthew, were partners, doing business at Cape Town, in the Colony of Good Hope. Pocock, whilst in England, shipped to his partner at Cape Town twenty-five packages of glassware and three carriages. In the carriages a large number of corks were packed, which were liable to duty. When the goods arrived at Cape Town, the respondent, Matthew, made an entry for the landing of the glassware and carriages, in which no mention was made of the corks. For this defect in the entry the whole shipment was seized. The Supreme Court of the colony decreed a forfeiture of the carriages, but gave judgment for the respondents in the action for the penalty. On appeal to the Privy Council it was contended, in the second case, that the respondent, Matthew, who made the entry, was liable to the penalty of treble the value of the goods, and that Pocock, who was in England at the time, was answerable for his partner's acts; but the court held that Matthew was liable for the penalty, and that Pocock, his partner, was not liable. Lord Cairnes, who delivered the opinion of the court, did not seem to think that the liability of Pocock was a matter to be considered, he not having participated in the actual entry. "I may put out of the case," he said, "the first respondent, Pocock, for it was admitted that there was no case of personal culpability against him." Personal, not imputed, culpability was here considered essential to a recovery by the crown.
It will be found on examination of the authorities that in all cases where a principal or partner has been held liable, penally or criminally, for the act of his agent or partner, the act was originally authorized or assented to, or subsequently adopted. The question in such cases has always been as to the effect of certain acts or employment as evidence of authorization, assent, or adoption, and it has always been held a matter for the jury.
*566 The cases of Rex v. Almon[*] and Attorney-General v. Siddon,[] usually cited against this position, are consistent with it. In the first case, a bookseller was proceeded against for a libel sold in his bookstore by his servant in the course of his employment, and Lord Mansfield held that the relation of the defendant to the act of sale was primâ facie evidence to establish his liability, but that he might avoid it by showing that "he was not privy nor assenting to it nor encouraging it." Here such was the nature of the employment as to imply primâ facie authorization of the sale and consequent publication of the libel by the master.
In the second case, a trader was held liable to a penalty for the illegal act of his servant done in conducting his business with a view to protect smuggled goods, although absent at the time. The case was an information for penalties, the second count of which charged that the defendant had harbored and concealed property upon which duties had not been paid. The court placed great reliance upon the fact that the possession of the property without explanation was primâ facie evidence to warrant conviction, and that the special circumstances detailed in connection with the transaction and the employment of the servant presented a primâ facie case of authorization by the master.
There are numerous cases where a principal or partner will be held liable for the fraud of an agent or partner although entirely ignorant of the fraud, as where goods are obtained by false and fraudulent representation; but the liability in such cases proceeds upon the ground that the title to the property in fact never passed to principal or partnership.[]
So a principal or partner will sometimes be held liable for the fraud of the agent or partner, which was not authorized, where the fruits of the fraud are retained; but the liability in these cases proceeds upon the ground that one cannot *567 claim immunity by reason of the fraud, and, at the same time, enjoy the benefits of the transaction. These cases properly fall under the head of implied adoption of the act of the agent or partner.[*]
So, sometimes, a principal or partner will be held liable where an agent or partner is allowed to exhibit an apparent authority which he does not possess, and, in consequence, fraudulently obtains the property or services of third parties; but the liability in such cases proceeds upon the principle that where one of two innocent parties must suffer, the party who, by his acts, clothes the agent with the apparent authority, and thus enables him to commit the fraud, ought to suffer.[]
In all these cases the principals or partners are held liable only to make good the loss occasioned by the fraudulent act of the agent or partner. The rule which governs these cases has no application to an action for penalties, which goes not, as already stated, for compensation or indemnification, but for punishment. Where penalties which are punitive, and not mere liquidated damages, are concerned, there must, in all cases, be personal culpability arising from original authorization of the fraudulent act, or assent to it, or its subsequent adoption with knowledge. This principle is of the highest importance, and its conservation is essential to a just administration of the law. As this principle was disregarded in the trial of this case in the court below, I think the judgment should, on that account, as well as for the other reasons stated, be reversed and the cause remanded for a new trial.
Mr. Justice MILLER concurred in the foregoing opinion on the ground that the statute of 1823 was repealed by that of 1866, and on the point that the act of 1823, when in *568 force, was not applicable to fraudulent importers. He stated that he expressed no opinion as to the instructions imputing knowledge of the guilty partner to the others.
Mr. Justice BRADLEY concurred generally; dissenting from the opinion of the court, on all the points taken in it.
NOTES
[*] United States v. Colt, Peters's Circuit Court, 145; Jacob v. United States, 1 Brockenbrough, 520; United States v. Bougher, 6 McLean, 277; Walsh v. United States, 3 Woodbury & Minot, 342; United States v. Lyman, 1 Mason, 482; United States v. Allen, 4 Day, 474.
[*] Vide United States v. Gooding, 12 Wheaton, 468; American Fur Company v. United States, 2 Peters, 364; and Cliquot's Champagne, 3 Wallace, 140.
[] Attorney-General v. Siddon, 1 Crompton & Jervis, 220; Rex v. Manning, 2 Comyns, 616.
[*] 3 Stat. at Large, 781.
[] 14 Id. 179.
[*] 1 Stat. at Large, 116, sec. 17.
[*] 4 Stat. at Large, 114.
[] U.S. v. Crane, 4 McLean, 317; U.S. v. Keene, 5 Id. 509.
[] 4 Stat. at Large, 116, sec. 8.
[*] 12 Meeson & Welsby, 39.
[*] Law Reports, 3 P.R.C. 345.
[*] 5 Burrow, 2686.
[] 1 Crompton & Jervis, 220.
[] Kilby v. Wilson, 1 Ryan & Moody, 178; Irving v. Motly, 7 Bingham 543; Root v. French, 13 Wendell, 570; Cary v. Hotailing, 1 Hill, 311.
[*] Bennett v. Judson, 21 New York, 238; Veazie v. Williams, 8 Howard, 134, 137.
[] Locke v. Stearns, 1 Metcalf, 560; Story on Partnership, sec. 108; Story on Agency, 443; Hern v. Nichols, 1 Salkeld, 289.